UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

GEORGE LAWSON,                          :

                    Plaintiff,          :
                                             05 Civ. 825 (JSR)(HBP)
     -against-                          :
                                             REPORT AND
NEW YORK CITY BOARD OF                  :     RECOMMENDATION
EDUCATION, et al.,
                                        :

                    Defendants.
                                        :
----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE JED S. RAKOFF, United States District

Judge,


I.  Introduction


          This is, in principal part, an employment discrimina-

tion action.  Plaintiff, a former teacher employed by the New

York City Department of Education, alleges that he was discrimi-

nated against on the basis of his national origin by being (1)

subjected to a hostile working environment, (2) subjected to

unequal terms and conditions of employment and (3) wrongfully

terminated (Amended Complaint ("Am. Compl.") ¶¶ 52-53), all in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e et seq.  Plaintiff also alleges (1) parallel discrimina-

tion claims under the New York State Executive Law § 290 et seq. and the New York City Administrative Code §§ 8-107(1)(a) et seq. (Am. Compl. ¶¶ 54-57), (2) claims for violations of his First Amendment right to free speech and his Fourteenth Amendment rights to due process and equal protection of the law  (Am. Compl. ¶¶ 60-64), (3) parallel constitutional claims under the New York State constitution (Am. Cpt. ¶¶ 65-68), (4) a claim for retaliation in violation of 42 U.S.C. § 1981 (Am. Compl. ¶¶ 75-77) and (5) parallel retaliation claims under New York State Executive Law §§ 290 et seq. and the New York City Administrative Code §§ 8-107(1)(a) et seq. (Am. Compl. ¶¶ 75-80).

By defendants' notice of motion dated August 30, 2010 (Docket Item 50), defendants move for summary judgment dismissing all claims.  Despite the fact that plaintiff's time to respond to the motion was never extended and despite the passage of almost six full months since defendants made their motion, as of 5:00 p.m. on February 24, 2011, all that plaintiff has filed is a fourteen-page memorandum of law (Docket Item 58) ("Plaintiff's Memo") that was filed on February 23, 2011.[1]  I have considered

_____

[1]On January 21, 2011, plaintiff requested an extension of time to February 21, 2011 to submit his opposition to defendants' motion; that application was denied (Docket Item 56).  My staff informally advised plaintiff's counsel after that date that if plaintiff made his submission before my report and recommendation
(continued...)

plaintiff's memorandum of law in resolving defendants' motion. For the reasons set forth below, I respectfully recommend that defendants' motion be granted.

II. <u>Facts</u>

    A. Facts Alleged in
       <u>the Amended Complaint</u>

     Plaintiff's Amended Complaint (Docket Item 9) alleges the following facts.

     In the fall of 2000, plaintiff began working as a full time Social Studies and Science teacher in Middle School 113 in the Bronx ("MS 113") (Am. Compl. ¶ 5). According to plaintiff, the student body of MS 113 is predominantly black and of West Indian national origin; a "much smaller" proportion of the teachers and administration are of West Indian national origin (Am. Compl. ¶ 7). When plaintiff commenced teaching at MS 113, the school had a Carribean Focus Team ("CFT") which plaintiff describes as being comprised of students who had immigrated from the West Indies within the last three years and teachers of West

_____

[1](...continued)
was completed, I would consider it. Despite the passage of more than a month since plaintiff's January 21 request, all that plaintiff is submitted is the fourteen page memorandum of law referenced in the text.

Indian National origin assigned to teach them and assist them with assimilation issues (Am. Compl. ¶ 7).

The events giving rise to plaintiff's claims allegedly began in September 2002 when a new acting principal, Cleveland Person, who is not of West Indian ancestry, was assigned to MS 113 (Am. Compl. ¶ 8).  In December of that year,

> in a faculty meeting, defendant Person was discussing
> the behavior of a student who allegedly defecated on
> the floor.  He called this a "cultural behavior."  Many
> of the students in the school are West Indian immi-
> grants or African immigrants.  The West Indian teachers
> viewed this statement as an insensitive statement
> toward persons of other national origins and several
> objected to Mr. Person's characterization.  Defendant
> Person defended his statement by listing cultures where
> he believed that defecating on the floor was in fact a
> cultural behavior, naming as examples the West Indian
> countries of Haiti and the Dominican Republic. . . .

(Am. Compl. ¶ 9).   Several teachers at MS 113 complained about Person's comments to both the United Federation of Teachers, a local community leader and others (Am. Compl. ¶ 9).  As a result of the negative response to Person's comments, he subsequently apologized for the remarks to the faculty at MS 113 (Am. Compl. ¶ 10).  The Amended Complaint does not detail any complaints made by plaintiff.

Despite the apology, however, plaintiff alleges that the teachers who complained about Person's comments, including plaintiff, were subsequently subjected to both discrimination and

retaliation (Am. Compl. ¶ 11).  In January 2003, plaintiff received an anonymous letter at school allegedly describing those who had complained about Person's statements as "'evil forces'" (Am. Compl. ¶ 12).  Person allegedly removed the work of plaintiff's students, who were mostly West Indian, and work of the West Indian students of other West Indian teachers from school bulletin boards, claiming that the removed work contained errors and did not merit being displayed as exemplary work.  The works of non-West-Indian students, however, was not subjected to the same standard (Am. Compl. ¶ 13).  In 2003, West Indian faculty were allegedly excluded from training opportunities and were denied access to books, equipment and other resources (Am. Compl. ¶ 14).  Plaintiff alleges that he was given only 19 social studies textbooks to share among 150 students (Am. Compl. ¶ 15) while non-West Indian teachers were given two copies of the same textbooks for each of their students so that the students could keep one copy in school and one at home (Am. Compl. ¶ 16).  Plaintiff also alleges that he was not given a copy of the teacher's edition of the social studies textbook while non-West Indian teachers were provided with the teacher's edition (Am. Compl. ¶ 17).  Plaintiff claims that his students were given very

limited access to the school library, while non-West Indian students were granted greater access[2] (Am. Compl. ¶ 18).

Plaintiff also alleges that most of the computers provided to his classes were broken and not repaired despite requests for repairs and despite the presence in the school of a cache of unused, operational computers (Am. Compl. ¶ 19). Plaintiff goes on to allege that the computers provided to non-West Indian students were in good order and that non-west Indian students were permitted to vandalize the computers in plaintiff's classroom (Am. Compl. ¶ 19). Plaintiff alleges that he and other West Indian faculty members were denied access to overhead projectors while other, non-West Indian faculty members were issued such projectors for use in their classrooms (Am. Compl. ¶ 20). Plaintiff also alleges that he was denied access to school facilities to provide extra help to students with their writing while white, non-West Indian faculty were granted access to the school's gym for student basketball practice (Am. Compl. ¶ 22). Plaintiff also alleges that West Indian students were denied access to after-school enrichment programs (Am. Compl. ¶ 23), were denied treatment by the school's nurse on terms equal to the

---

[2]The Amended Complaint does not detail the frequency with which West Indian students and non-west Indian students were granted access to the library.

treatment provided to non-West Indian students (Am. Compl. ¶ 24) and were admonished more harshly than non-West Indian students (Am. Compl. ¶ 25).

Plaintiff claims that he complained of the disparate treatment afforded to him and other West Indian faculty members but that no remedial action was taken (Am. Compl. ¶ 21).

Plaintiff further alleges that as a result of his complaints of discrimination and "his comments on various other matters of public concern involving the education of the children and the treatment of the teachers" he was subjected to a pattern of retaliation (Am. Compl. ¶ 27).  Specifically, he claims that he was subjected to unjustified "write ups" concerning his performance while non-West Indian teachers were not written up for engaging in identical conduct and that he was written up for lateness while non-West Indian teachers who arrived at school at the same time as plaintiff were not written up (Am. Compl. ¶ 27). He also alleges that he was subjected to more frequent monitoring than other teachers (Am. Compl. ¶ 28).  Finally in May and June 2003, plaintiff and other West Indian teachers were advised that they would receive unsatisfactory performance reviews for the year which would result in their termination and were given a choice of either resigning or being terminated (Am. Compl. ¶ 29).

Plaintiff refused to resign and was terminated on or about June 13, 2003 (Am. Compl. ¶¶ 30-31).

Plaintiff appealed his unsatisfactory rating and his termination (Am. Compl. ¶¶ 30-31).

Plaintiff claims that four days after his termination, a student found copies of an anonymous letter in plaintiff's class room. "It was addressed, 'To all the Barbarians and Banana Boat Niggers in MS 113' and it named various West Indian teachers, including plaintiff Lawson . . . . The letter contained obscene and racially offensive language and stated that the named teachers would all be removed from the school" (Am. Compl. ¶ 32). Plaintiff claims that the school's administration did not report the letter to either the New York City Board of Education or the police (Am. Compl. ¶ 32).  After receiving numerous complaints about the letter, acting principal Person promised to make an effort to investigate the letter but took no action (Am. Compl. ¶ 33).  The Amended Complaint contains no allegations connecting the anonymous letters to defendants.

Plaintiff claims that he complained of discrimination and retaliation to the New York City Board of Education's Office of Educational Opportunity at some unspecified time, but that the complaint was rejected on July 16, 2003 (Am. Compl. ¶ 34).

No West Indian teachers were hired to replace the West Indian teachers who were terminated from MS 113 in June 2003, and the West Indian teachers who did remain at MS 113 lost their home room assignments and were required to "float" (Am. Compl. ¶ 35). It is not clear from the Amended Complaint whether "floating" or having an assigned home room was more desirable or what the demands of each assignment were.

Because the appeal from his rating for the 2002-03 school year was still pending, plaintiff was rehired to teach at CIS 22 in the fall of 2003 (Am. Compl. ¶ 36). However, he was only compensated at the lower rate paid to substitute teachers and did not received any of the fringe benefits provided to full time teachers (Am. Compl. ¶ 36). Plaintiff was instructed to stop coming to work at CIS 22 in October 2003, and he was terminated from his position in January 2004. Plaintiff alleges that he was terminated because Person had intervened with the principal of CIS 22 and advised him not to hire plaintiff back (Am. Compl. ¶ 36).

In January 2004, the New York City Board of Education formally denied plaintiff a license to teach due to the unsatisfactory rating he had received at MS 113. Plaintiff had previously been granted a license that was valid through August 2005 (Am. Compl. ¶ 37).

9

The United Federation of Teachers subsequently filed a grievance on plaintiff's behalf which resulted in the reversal of plaintiff's unsatisfactory rating and his reinstatement at a middle school in September 2004; he was not, however, awarded back pay or seniority credit for the portion of the 2003-04 year that he did not work (Am. Compl. ¶ 38).

In September 2004, the Deputy Superintendent Jose Ruiz of Region 2 in the Bronx directed plaintiff to report for work as a social studies teacher at Middle School 135 (Am. Compl. ¶¶ 43-44).  However, when plaintiff reported for work the principal gave plaintiff a letter from Ruiz informing him that the position to which plaintiff had been assigned was no longer available and that the only position available was a substitute/per diem position (Am. Compl. ¶¶ 45-47).  Plaintiff refused to accept this position (Am. Compl. ¶ 47).

Despite the Amended Complaint's clear allegation that plaintiff refused the position he was offered at Middle School 135, it inexplicably goes to allege that plaintiff was mistreated in a number of ways that suggest plaintiff did accept the position.  For example, plaintiff alleges that the principal at MS 135 commented that plaintiff was not tenured, implying that he could be easily fired (Am. Compl. ¶ 49(c)), a student was arrested for punching a white non-Caribbean teacher while physical

attacks on plaintiff were either ignored or treated more lightly (Am. Compl. ¶ 49(d-e)), white non-Carribean faculty members were warned of impending negative performance reviews while plaintiff received no such warnings (Am. Compl. ¶ 49(f)), the issuance of an unsatisfactory rating to plaintiff did not comply with the operative of provisions of the parties' collective bargaining agreement (Am. Compl. ¶ 49(g)), plaintiff was singled out for observation (Am. Compl. ¶ 49(i)), after receiving an unsatisfactory rating, plaintiff was not given the same opportunity to transfer that was given to other teachers (Am. Compl. ¶ 49(j)) and plaintiff was falsely accused of inflicting capital punishment on a student while similar allegations against white faculty members were not reported to the Office of Special Investigations (Am. Compl. ¶ 49).

    B.  Facts Defendants Claim
        Are Established by Discovery

        In their unrebutted statement pursuant to Local Civil Rule 56.1, defendants contend that the following facts have been established either through discovery or by affidavits submitted in connection with the pending motion.  As set forth in more detail below, the picture painted by defendants depicts plaintiff as a faculty member with persistent performance problems.

Plaintiff was an uncertified provisional preparatory teacher at MS 113 from September 2000 through June 2003 (Defendants' Rule 56.1 Statement in Support of Motion for Summary Judgment (Docket Item 55) ("Rule 56.1 Statement") ¶ 12; Affidavit of Philip Crowe, sworn to August 24, 2010 (Docket Item 51)("Crowe Aff.") ¶¶ 3-4).  Many of the teachers at MS 113 were African American and/or of Carribean descent; plaintiff does not know if the number of teachers of Carribean descent changed during his tenure there (56.1 Statement ¶ 14; Declaration of Lawrence J. Profeta, dated August 30, 2010 (Docket Item 53)("Profeta Decl.") Ex. 33 at 66-69).  MS 113's Assistant Principal during the 2002-03 school year, Leia McKinley is of West Indian descent (56.1 Statement ¶ 22; Ex. 36 to Profeta Decl. at 113, 116-17).

Marlene Filewich was District Superintendent of Community School District 11 from 2000 through 2003 and oversaw MS 113 and its principal (56.1 Statement ¶ 15; Ex. 37 to Profeta Decl. at 6-9).

Plaintiff testified that both Caribbean and non-Caribbean teachers taught CFT classes and that, notwithstanding its name, CFT classes were comprised of Caribbean, American, African and Asian students (56.1 Statement ¶ 20; Ex. 33 to Profeta Decl. 88-89, 97).  The funds for the CFT were greatly restricted in the 2002-03 school year as a result of budget cuts resulting from the

2002 New York City budget crises (56.1 Statement ¶ 21; Ex. 37 to
Profeta Decl. at 46-50).

Filewich participated in the selection of Person to
serve as interim principal of MS 113 (56.1 Statement ¶ 16; Ex. 37
to  Profeta Decl. at 15-16).  At the time Person was appointed as
interim principal, there was concern that classroom instruction
at MS 113 was deficient, and Person was instructed to focus on
attendance and suspension rates (56.1 Statement ¶ 17; Ex. 37
Profeta Decl. at 51-52, 121).

When Person started at MS 113, he found that teachers
had not been required to have proper lesson plans; Person in-
structed the teachers at the school that he would insist in
teachers being punctual, having proper lesson plans and would
prohibit the posting of error-ridden student work as examples for
other students (56.1 Statement ¶ 18, Ex. 35 to Profeta Decl. at
61-62, 72-73).

Assistant Principal McKinley observed plaintiff's
social studies class on October 15, 2002, noted that students
were not engaged in the lesson, that one student was sleeping and
rated plaintiff's performance as unsatisfactory (56.1 Statement ¶
23; Ex. 7 to Profeta Decl.).  McKinley made the following recom-
mendations:

Although the Social Studies textbook is titled "The American Journey" this particular lesson dealt with the Renaissance Period of European history and the opening up of trade routes between Europe and Asia. The N.Y. State Social Studies Standard for this lesson should have been given to the Students as Standard #2 -- World History.

The Aim of this lesson as stated in your lesson plan and on the large chart was related to "Europeans Investing in Overseas Exploration." However, this actual lesson presented to the students said nothing about "European Overseas Exploration." Also, in the lesson plan that you presented to me, you did not specify the exact homework assignment. . . .

                    *      *      *

All students in the class should have the opportunity to participate in the lesson. By actively involving students in the lessons, you will prevent inattentiveness. . . . You should attempt to teach with more enthusiasm, which is essential for students to perform willingly and to their fullest capacity. Try to use other methods of teaching besides lecturing.

Mr. Lawson, I observed that your students were completing the tasks that you had assigned to them. However, there was confusion as to the written "Aim" and the actual lesson. Moreover, in the attached lesson plan that you handed me, in the "Aim" you misused the word "led", which should have been "lead." It is important that you strive to bring out the best potential from every student. Every good lesson plan should keep the students engaged for the entire period, and bring out in them an eagerness for learning. I am available to help you achieve these goals, and I will revisit your classroom to observe how well you have implemented the suggested recommendations. . . .

(56.1 Statement ¶ 23; Ex. 7 to Profeta Decl.). Plaintiff filed

an unsuccessful grievance concerning McKinley's unsatisfactory

rating (56.1 Statement ¶ 24; Ex. 33 to Profeta Decl. at 120, 128)

2002-03 was plaintiff's first year teaching social studies to an eighth-grade class, and McKinley recommended that plaintiff "buddy-up" with another, more experienced social studies teacher, Mr. Cassidy, who was the social studies consultant and the lead teacher in MS 113's Social Studies Department (56.1 Statement ¶ 25; Ex. 36 to Profeta Decl. at 75-78; see also Exs. 8, 9 to Profeta Decl.).  Plaintiff did not follow up with Mr. Cassidy, and plainitff claimed to be unavailable when Mr. Cassidy tried to meet with plaintiff (56.1 Statement ¶ 26; Ex. 36 to Profeta Decl. at 77).

McKinley visited plaintiff's classroom again on November 12, 2002.  When she asked to review the lesson plan, plaintiff gave her a lesson plan that was different from what he was actually teaching, which McKinley took to mean that he did not actually have a lesson plan for the class.  McKinley directed plaintiff in writing to have a written lesson plan for all future classes (56.1 Statement ¶ 27; see Ex. 10 to Profeta Decl.).  Plaintiff objected to McKinley's written admonition, considered it harassment and also filed a grievance as to it; this grievance was also unsuccessful (56.1 Statement ¶ 28; Ex. 33 to Profeta Decl. at 125-28).

McKinley visited plaintiff's classroom a third time on December 6, 2002 and noted that plaintiff did not have an "Aim,"

15

a "Do Now" assignment or homework written on the blackboard.
When McKinley asked plaintiff for his lesson plan, he stated that
he had "forgot it in the car" (56.1 Statement ¶ 29; Ex. 11 to
Profeta Decl.).  Plaintiff believed that McKinley's repeated
visits to his classroom were excessive and constituted harassment
(56.1 Statement ¶ 30; Ex. 33 to Profeta Decl. at 109-14).
McKinley testified at her deposition she was following procedures
for the observation of non-tenured or probationary teachers who
were observed more frequently than tenured teachers (56.1 State-
ment ¶ 31); Ex. 36 to Profeta Decl. at 111-12).

          Defendants admit that in December 2002, Person met with
MS 113's staff, discussed that there was a problem with someone
defecating in the halls and stated that it could be reflective of
cultural behavior.  Defendants note, however, that Person made
his comments after consulting with a guidance counselor and that
the guidance counselor had advised Person that the conduct could
be reflective of cultural behavior by students of Asian, African
or Middle Eastern backgrounds (56.1 Statement ¶ 34; Ex. 35 to
Profeta Decl. at 26-28).  After then meeting with the school's
staff, Person met with Filewich (56.1 Statement ¶ 35; Ex. 37 to
Profeta Decl. at 20-22).  Filewich directed Person to conduct
another meeting with the school's staff to apologize for his
remarks and to send a letter to the staff apologizing for the

remarks in writing (56.1 Statement ¶ 35; Ex. 37 to Profeta Decl. at 32-34).  Person complied with these directions (56.1 Statement ¶ 35; Ex. 12 to Profeta Decl.; Ex. 35 to Profeta Decl. at 34-35).

Person also met with the Executive Board of the MS 113's Parents' Association concerning his comments after which the Parents' Association issued a letter a stating that it "ha[d] concluded that the allegations [about Person's comment] were misconstrued and the words taken out of context," and that the Parents' Association "stands firmly behind Mr. Person's objective to serve [the school's] children by improving the guidelines and standards of the school" (56.1 Statement ¶ 36; Ex. 13 to Profeta Decl.).

Plaintiff testified that after Person's apology, he and all the school's other teachers received a letter in support of Person which plaintiff considered to be "'hate mail'" (56.1 Statement ¶ 37; Ex. 37 to Profeta Decl. at 195-97).  In the weeks after Person's December 2002 comment, plaintiff alleges that "those teachers who had complained about defendant Person's statement, including plaintiff, began facing an onslaught of further discrimination and retaliation" (56.1 Statement ¶ 38; Am. Compl. ¶ 11).

With respect to plaintiff's allegations that Person began removing the work of Caribbean students from bulletin

boards after his December 2002 comments (Am. Compl. ¶ 13), Person
testified that he would mark the errors on the posted work and
would remove the work only if the errors were not corrected (56.1
Statement ¶ 40; Ex. 35 to Person Decl. at 150-53).  Filewich
testified that on one occasion she directed Person to remove a
piece of student work from a bulletin board outside of plain-
tiff's classroom because the item contained spelling and grammat-
ical errors and was not, therefore, appropriately posted as a
model; plaintiff subsequently complained to Filewich about the
piece's removal (56.1 Statement ¶ 41; Ex. 37 to Profeta Decl. at
57-59).

Plaintiff also testified that after Person's December
2002 comments, the quality of the textbooks he received changed
for the worse and that he was only given 22 textbooks while some
non-Caribbean teachers received double sets of textbooks (56.1
Statement ¶ 42; Ex. 33 to Profeta Decl. at 153-56; Am. Compl. ¶¶
15-16, 21).  Defendants, however, have submitted evidence that
all teachers at MS 113 were issued textbooks based on the number
of students in the teacher's class and that the textbooks were
used primarily as classroom resources because only a small
percentage of MS 113 students could read at grade level (56.1
Statement ¶ 43; Ex. 38 to Profeta Decl. at 55-57).  Assistant
Principal McKinley testified that all the teachers on plaintiff's

floor received the same allocation of textbooks (56.1 Statement ¶ 44; Ex. 36 to Profeta Decl. at 98-99).  When Filewich went to MS 113 to observe plaintiff informally in the 2002-03 school year, she saw books strewn on the floor in plaintiff's classroom (56.1 Statement ¶ 45; Ex. 37 to Profeta Decl. at 121-24, 144-45).  Person testified that when he learned that the textbooks issued to plaintiff were torn and dirty, he directed Assistant Principal McKinley to issue replacements for them (56.1 Statement ¶ 49; Ex. 35 to Profeta Decl. at 94-95, 156).

In response to plaintiff's allegation that he was not issued a teacher's edition of a Social Studies textbook, defendants offer evidence that each social studies teacher was issued a teacher's edition at the start of the school year and that additional copies would be made available upon request from Assistant Principal McKinley (Declaration of Leia McKinley, dated August 24, 2010 (Docket Item 52) ("McKinley Decl.") ¶ 3).

In response to plaintiff's allegations that he was issued non-functioning computers and denied an overhead projector (Am. Compl. ¶¶ 19-20), defendants offer evidence that there was an overhead projector in plaintiff's classroom at the start of the 2002-03 school year, but admits that overhead projectors that were severely damaged during the course of the school year may not have been replaced (McKinley Decl. ¶ 6).  Contemporaneous

19

documentary evidence indicates that plaintiff complained to school officials about damage to the computers in his classroom resulting from the student conduct (56.1 Statement ¶ 54; McKinley Decl. ¶ 6).  Person testified, however, that plaintiff was not the only faculty member who complained about computers being broken and in disrepair (56.1 Statement ¶ 55; Ex. 35 to Profeta Decl. at 211-13).

In response to plaintiff's claims that students of Caribbean ancestry were not given the same access to school facilities that other students enjoyed (Am. Compl. ¶ 22), defendants offer evidence that during the 2002-03 school year, Person initiated a policy providing that any person seeking to use the school's premises for after school activities was required to obtain written permission and identify all the students participating in the activity (56.1 Statement ¶ 57; Ex. 35 to Profeta Decl. at 66-69).  Plaintiff testified that he was never aware of this procedure (56.1 Statement ¶ 58; Ex. 34 to Profeta Decl. 22-25).

Assistant Principal McKinley observed plaintiff's class for a fourth time on February 24, 2003 and again rated plaintiff's performance as unsatisfactory.  The memorandum of her visit contained the following comments:

As I entered the classroom, the teacher was in the process of writing the **Aim** on the board. . . . The teacher also wrote, **"Do Now**: Lincoln's Gettysburg Address". There was no direction as to a "Do Now task" in which the students were to be engaged. The teacher concluded by writing the homework assignment which consisted of an article and several sentences to be written by the students. This writing process took 5 minutes, the students were not focused, and the class-room was noisy. . . .

. . . The teacher . . . produced one rexographed paper and asked the students to pass it around for the entire class to view. The teacher did not reveal the purpose of this paper, and there was no tie-in regard-ing the paper with the lesson. While the teacher's lesson plan, which was given to me when I entered the room, mentioned "Materials: Copies of Gettysburg Address" this is not what was on the rexographed paper. There were no copies of the Gettysburg Address distrib-uted to the students during this lesson. . . . [T]he students defined "score" as settling a score in battle. The teacher did not explain that Lincoln used "score" to mean 20 years. Also, the teacher misspelled the word "consecrate", writing it as "consccrate" and did not correct this error. . . .

When the bell rang to signal the end of the learn-ing period, the teacher then tried to quickly ask key pivotal questions. There was no time for the students to listen or respond, as they were packing up to leave. There was no summary of this lesson. Attendance was not taken, and the previous day's homework was not checked or collected.

\*       \*       \*

Mr. Lawson, I observed that the students in your class were not totally engaged in learning. . . . You have been assigned to work with a lead teacher, and a Social Studies consultant, to assist you in establish-ing classroom management routines to help you bring out the best potential from each student. I would advise that you visit with this teacher and observe how better structure can be established. I have offered my help

to you on several occasions, and will continue to do
so. . . .

(56.1 Statement ¶ 59; Ex. 17 to Profeta Decl.).

Plaintiff wrote to the Department of Education's
Chancellor, Joel Klein, on May 27, 2003 (56.1 Statement ¶ 61).
In his letter he claimed that there was a crisis at MS 113 that
started when Person was assigned as acting Principal.  Plaintiff
complained of doorstops being "illegally" attached to doors,
private entities soliciting business on school property during
school hours and Person's December 2002 comments concerning
"cultural behavior."  Plaintiff claimed in the letter that the
faculty members who were critical of Person's cultural behavior
comment were "lambasted by UFT Chapter Leader, Paul Egan, who
warned us of the backlash that could follow, for taking the stand
we took."  Plaintiff went on to claim that retaliatory conduct
had already taken place:

> The fact that many of us either openly or quietly
> disagreed with Mr. Persons's concept about our culture
> did not go down too well with at least one administra-
> tor. . . . That administrator has unleashed a pattern
> of harassment on us . . . **She has targeted us and the
> students in our home room to the point where at least
> two of us (teachers and students) have been denied
> materials that we should be provided with, to teach our
> students.  We have not been provided with copy papers,
> laptop computers, textbooks, teachers'** [sic] **edition of
> textbook . . . overhead projectors . . . among other
> basic essential teaching aids we have been denied,
> while our contemporaries have been provided with these
> and more materials. . . .**

22

\*      \*      \*

Since then I have been subjected to some abuses from several quarters here in the school.  On one occasion in the presence of one of my co-worker[s] I was called "slime" by one of my supervisor[s], Ms. Leia McKinley . . . . She has been constantly harassing my homeroom class, fellow West Indians, and African teachers, all of whom have stood our ground, that we are not "barbarians".

 . . . Another example is the destruction of a computer keyboard by some student, in the presence of Ms. McKinley, who did nothing about it.  Her refusal to do anything to address other violent actions on the part of students from Class 838 who have exhibited violent behavior in my class. . . . **In one instance some violent students from Class 838 were throwing heavy textbooks at each other** . . . .

**My problem with Ms. McKinley began early in the school year, when I reported a serious sexual harassment incident [by students] to her. . . . Since then I have been denied enough Social Studies Textbooks for my students, despite the fact that our contemporaries have been provided with these materials, which are in abundance at the school. . . .**

**. . . We are told to make sure that all students [sic] work that goes upon [sic] the bulletin board are [sic] exemplary work, no spelling or grammatical errors, yet those who are issuing such directives are themselves sending around memos and letters home to parents and teachers with spelling errors (please see attach [sic] letters).**

(56.1 Statement ¶ 61; Ex. 19 to Profeta Decl.).

Plaintiff received an unsatisfactory rating on his annual performance review on June 10, 2003 on the basis of McKinley's classroom observations (56.1 Statement ¶ 62; Ex. 35 to Profeta Decl. at 103; Ex. 20 to Profeta Decl.).  On June 13,

2003, plaintiff was informed that his services at MS 113 were no longer needed (56.1 Statement ¶ 63; Ex. 21 to Profeta Decl.).

Plaintiff testified that four days later, while sweeping out plaintiff's classroom, a student found a number of envelopes, all containing the identical anonymous letter.  The letter was addressed to "all the Barbarians and Banana Boat Niggers in MS 113, named various West Indian teachers including plaintiff and stated that all the named teachers wold be removed from the school (56.1 Statement ¶ 64; Ex. 33 to Profeta Decl. at 183-86).  After seeing the letters, plaintiff called two other members of the Caribbean Focus Team to his classroom and they began opening the letters (56.1 Statement ¶ 65; Ex. 33 to Profeta Decl. at 186-88).  Plaintiff did not immediately notify Person of the letters; plaintiff disseminated them to other teachers instead (56.1 Statement ¶ 66; Ex. 35 to Profeta Decl. at 170-74). After one of the other teachers who received a copy of the letter reported the incident to the UFT, the UFT accused plaintiff of writing the letter (56.1 Statement ¶ 67; Ex. 33 to Profeta Decl. at 190-91).  Person subsequently received a copy of the letter, and it was reported to Filewich, the Department of Education's Equal Employment Office, the Department of Education's Office of Investigation (56.1 Statement ¶ 68; Ex. 23 to Profeta Decl.). The subsequent investigation by these entities and by the New

York City Police Department was unable to determine who was
responsible for the letter (56.1 Statement ¶ 70; Ex. 23 to
Profeta Decl.; Ex. 35 to Profeta Decl. at 174-76).

Sometime after June 17, 2003, plaintiff filed a form
entitled "Complaint of Alleged Discrimination Form" with the
Department of Education (Ex. 25 to Profeta Decl.).  Although the
form itself is undated, it claims that acts of discrimination
occurred on June 17, 2003 and must, therefore, have been submit-
ted after that date.  The Department of Education subsequently
investigated plaintiff's claims and concluded they were unfounded
(Ex. 26 to Profeta Decl.).

After his termination from MS 113, plaintiff was
assigned to work at CIS 22 as a per diem substitute teacher (56.1
Statement ¶¶ 74, 76; Am. Compl. ¶ 36; Ex. 27 to Profeta Decl.).
In October 2003, the principal of CIS 22 advised plaintiff that
he needed to resolve certain issues concerning his license;
plaintiff subsequently took a certification test and was advised
not to return to CIS 22 (56.1 Statement ¶ 75; Ex. 34 to Profeta
Decl. at 88-89).  Although plaintiff filed a grievance concerning
the salary and benefits he received while working at CIS 22, the
grievance was unsuccessful (56.1 Statement ¶ 76; Ex. 27 to
Profeta Decl.).

Plaintiff had filed a grievance concerning the unfavor-able performance rating he had received for the 2002-03 school year, and that grievance was resolved in plaintiff's favor in February 2004 (56.1 Statement ¶ 77).  Throughout the Spring of 2004 plaintiff was repeatedly offered teaching positions for the 2004-05 school year (Ex. 28 to Profeta Decl.).  He was ultimately hired as a traveling teacher assigned to MS 135 for the 2004-05 school year (56.1 Statement ¶ 78; Ex. 39 to Profeta Decl. at 50-51).

Plaintiff claims that he was subject to retaliation at MS 135 because the principal was rude to him when he first appeared for work (56.1 Statement ¶ 79; Ex. 34 to Profeta Decl. at 36-37).  Plaintiff believed that the principal was angry with him because plaintiff had been assigned to the school by the Department of Education, and the principal of MS 135 had not hired plaintiff himself (56.1 Statement ¶ 80; Ex. 34 to Profeta Decl. at 37-38; see Ex. 39 to Profeta Decl. at 8-9).  Plaintiff testified that he did not receive a locker and a closet at MS 135 and complained that he was not provided with educational re-sources at MS 135 (56.1 Statement ¶¶ 81-82; Ex. 34 to Profeta Decl. at 39-40).  Although the administration at MS 135 promised to provide plaintiff with additional educational resources, the promises were never fulfilled (56.1 Statement ¶ 82; Ex. 34 to

26

Profeta Decl. at 66-68). While at MS 135, plaintiff posted pictures of notable African Americans, but was told to take them down because it was not black history month (56.1 Statement ¶ 83; Ex. 34 to Profeta Decl. at 40-41).

In October 2004, the assistant principal at MS 135 observed plaintiff's class and sent plaintiff an evaluation noting the following:

> I entered the room at 8:30 am, as the students were entering the room. Mr. Lawson arrived a few moments later.
>
> *     *     *
>
> **Recommendations:**
>
> 1. Students need to start to work as soon as they arrive in the room. You did not have any assignment for them to do and, as a result, it was 9 minutes into the period before they were given a Do Now assignment. As a traveling teacher, it is imperative that you write your Do Now assignment and the aim of the lesson on a large pad that you prop on the chalk board ledge. Train the students to sit in their chairs and immediately commence the Do Now assignment. . . .
>
> 2. Though you attempted group activities, each student worked on the assignments on his/her own and did not speak to each other. The students were given no guidance as to how each member at the table was to work. . . .
>
> 3. I checked the social studies notebook of a student sitting next to me and I was very concerned when I saw that you had used the same aim for lessons on October 6, 7, 8, 13 and 14, 2004. We discussed that what you considered an aim is really an objective of a unit of study . . . .

27

> 4. There was too much "dead time" in the period when
> the students did nothing. . . . You must plan your
> lessons carefully so as not to waste a moment of class
> time.  The students need to be engaged throughout the
> lesson.

> 5. By mid-October, you should have been much farther
> into the social studies course of study . . . . Please
> use the guides . . . to pace yourself.  Work with other
> teachers to be sure that you are working at the proper
> pacing for the students to finish the curriculum by the
> end of the year.

(56.1 Statement ¶ 84; Ex. 29 to Profeta Decl. at 1-2).  In the
course of the evaluation, plaintiff stated that he felt hindered
because students did not have copies of the textbook to take, and
the assistant principal advised plaintiff to consult with other
teachers to learn how they confronted this obstacle (56.1 State-
ment ¶ 85; Ex. 29 to Profeta Decl. at 2, ¶ 2).  The assistant
principal gave plaintiff an "unsatisfactory" rating for the
lesson (56.1 Statement ¶ 84; Ex. 29 to Profeta Decl. at 3).

The parents of plaintiff's students at MS 135 also
complained concerning plaintiff's performance (56.1 Statement ¶
86; Ex. 34 to Profeta Decl. at 66; Ex. 39 to Profeta Decl. at 87-
88).

In December 2004, a different assistant principal
observed plaintiff's class.  Her written review noted the follow-
ing:

> You came into the room at 1:35 pm as the children were
> assembling and you began placing your paper charts with

28

the <u>do</u> <u>now</u>, the <u>aim</u>, and questions on the board. . . .
You called on two children to answer the question about
the laws and the [Boston] tea party.  One child said
that the work had been done in previous lessons

* * *

You asked the children, who were seated in groups, to
summarize the first six paragraphs of page 63 of the
handout and to answer the questions posted on the
board.  One child said that the homework had been the
same assignment and asked why they had to do the same
thing again? [<u>sic</u>] You did not respond. . . .

* * *

<u>Recommendations:</u>

1.  Although you attempted to create a point of entry
(POEM) lesson, the children did not work in groups.
They were sitting in groups, but working individually
and silently.  Their work consisted of copying notes
and answering questions from the article you distrib-
uted to them and the questions you had written for
them.  Group work must be challenging, interesting and
require students to interact with each other purpose-
fully.

2.  You attempted to bring interesting and relevant
facts into your lesson by including the references to
King, Gandhi, and Malcolm X.  However, the children did
not relate to these references.  You needed to clearly
explain who these persons were and the context of their
times. . . .

3.  At the same time that you were mentioning King and
Gandhi, the children were trying to copy notes into
their books as instructed by you.  Children need order
in their learning.  You were asking them to read,
write, listen, and respond at the same time.  Asking
students to listen to you, read and write notes simul-
taneously is confusing and does not allow them to
focus.  This is not way [<u>sic</u>] to get them to learn.

4.  At the end of the lesson, when the first bell rang, you were still talking to the children about facts surrounding the tea party.  Children were trying to pack their belongings and you were shouting at them to remain in their seats.  Your pacing of the lesson was poor.  When the second bell (signaling the end of the period and the end of the day) rang, you were still shouting at the children to stay in their seats in order to give them homework.  The homeroom class was trying to enter, several of your students were leaving and you were still giving instructions for work.  You need to establish organized and well-paced lessons.

5.  It is important that instruction be standards based.  Please develop rubrics with your students to help them determine the quality of their work. . . .

6.  Two children had their heads down and five children, in two different groups, were socializing during the lesson.  You did not address them.  Please be aware of all of the children in your class as you are teaching and engage all children in each lesson.

Please make an appointment by close of business on Friday, January 14, 2005 to meet with me to collaboratively develop a professional improvement plan.

The assistant principal's overall rating for the lesson was unsatisfactory (56.1 Statement ¶ 87; Ex. 30 to Profeta Decl. at 1-3).

On or about January 21, 2005, plaintiff was given a professional improvement plan.  It directed plaintiff to observe other, identified teachers to learn their techniques, to meet weekly with another teacher who would serve as plaintiff's advisor, to keep a notebook documenting the behavior of his students and to keep his own, personal performance journal (56.1

Statement ¶ 88; Ex. 31 to Profeta Decl.; Ex. 39 to Profeta Decl. at 40-42, 88-89).  Plaintiff failed to follow through with the directions set forth in the professional improvement plan (56.1 Statement ¶ 90; Ex. 39 to Profeta Decl. at 55-56, 99).

Plaintiff reported that he sustained an injury in the workplace on or about March 28, 2005 and left MS 135 that day; he never returned to the school thereafter (56.1 Statement ¶ 92; Ex. 39 to Profeta Decl. at 24-26, 42-43, 56).  Plaintiff received an overall rating of unsatisfactory for the 2004-05 school year (56.1 Statement ¶ 93; Ex. 32 to Profeta Decl.; Ex. 39 to Profeta Decl. at 35-36, 53-55).[3]

---

[3]In his memorandum of law in opposition to defendants' motion, plaintiff identifies a number of disputes he has with the administration at MS 135 concerning the integrity of the grades awarded at that school (Plaintiff's Memo at 3-4).  Plaintiff does not allege any facts or offer any evidence that race or national origin played any role in these disputes.

III.  Analysis

A.  Summary Judgement
    Standards

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  This form of relief is appropriate when, after discovery, the party -- here plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact.  An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).  Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993).  If the nonmovant fails to meet this burden, summary judgment will be granted against it.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.
2004); accord Jeffreys v. City of New York, 426 F.3d 549, 553-54
(2d Cir. 2005); Gallo v. Prudential Residential Servs., Ltd., 22
F.3d 1219, 1223-24 (2d Cir. 1994).

      "Material facts are those which 'might affect the
outcome of the suit under the governing law,' and a dispute is
'genuine' if 'the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.'" Coppola v. Bear
Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007), quoting Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord McCarthy
v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007).
"'[I]n ruling on a motion for summary judgment, a judge must ask
himself not whether he thinks the evidence unmistakably favors
one side or the other but whether a fair-minded jury could return
a verdict for the [non-movant] on the evidence presented[.]'"
Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir.
2007), quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295,
298 (2d Cir. 1996).

>      The party seeking summary judgment has the burden
> to demonstrate that no genuine issue of material fact
> exists . . . .  In determining whether a genuine issue
> of material fact exists, a court must examine the
> evidence in the light most favorable to, and draw all
> inferences in favor of, the non-movant . . . .  Stated
> more succinctly, "[t]he evidence of the non-movant is
> to be believed."

Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253-54 (2d Cir. 2002) (citations omitted).  See also Jeffreys v. City of New York, supra, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."), quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996); accord Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

        "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Vann v. City of New York, 72 F.3d 1040, 1048 (2d Cir. 1995).  "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."  Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996).

        The Court of Appeals for the Second Circuit has explained that "in determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of

34

undisputed facts contained in the moving party's Rule 56.1
statement.  It must be satisfied that the citation to evidence in
the record supports the assertion." Vt. Teddy Bear Co., Inc. v.
1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also
Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).
Each paragraph of the defendants' 56.1 Statement is appropriately
supported by a citation to either evidence in the record or an
allegation in the Amended Complaint.

Summary judgment is "ordinarily inappropriate" in
employment discrimination cases where the employer's intent and
state of mind are in dispute.  Carlton v. Mystic Transp., Inc.,
202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Vill. of Babylon,
93 F.3d 47, 54 (2d Cir. 1996); see Gallo v. Prudential Residen-
tial Servs., supra, 22 F.3d at 1224; Montana v. First Fed. Sav. &
Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759
F.2d 989, 998 (2d Cir. 1985).  Moreover, in discrimination cases

> summary judgment may not be granted simply because the
> court believes that the plaintiff will be unable to
> meet his or her burden of persuasion at trial . . . .
> There must either be a lack of evidence in support of
> the plaintiff's position, . . . or the evidence must be
> so overwhelmingly tilted in one direction that any
> contrary finding would constitute clear error.

Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998)
(citations omitted).  See Weber v. Parfums Givenchy, Inc., 49 F.
Supp. 2d 343, 354 (S.D.N.Y. 1999) (Wood, D.J.).

Although the central role of intent requires that
caution be exercised in addressing a summary judgment motion made
in a discrimination case, "'the salutary purposes of summary
judgment -- avoiding protracted, expensive and harassing trials
-- apply no less to discrimination cases than to . . . other
areas of litigation.'"  Abdu-Brisson v. Delta Air Lines, Inc.,
239 F.3d 456, 466 (2d Cir. 2001), quoting Meiri v. Dacon, supra,
759 F.2d at 998.  Thus, the Court of Appeals for the Second
Circuit has expressly "remind[ed the] district courts that the
'impression that summary judgment is unavailable to defendants in
discrimination cases is unsupportable.'"  Weinstock v. Columbia
Univ., 224 F.3d 33, 41 (2d Cir. 2000), quoting McLee v. Chrysler
Corp., 38 F.3d 67, 68 (2d Cir. 1994).

Finally, even when a summary judgment motion is unop-
posed, the Court must examine the record to determine whether a
genuine issue of fact exists for trial; a summary judgment motion
cannot be granted on default.  Vt. Teddy Bear Co. v. 1-800
Beargram Co., supra, 373 F.3d at 244.

B.   Plaintiff's Claims

The Amended Complaint asserts a total of sixteen claims:  (1) harassment, a hostile work environment and unequal terms and conditions of employment in violation of Title VII (Am. Compl. ¶ 52); (2) wrongful termination in violation of Title VII (Am. Compl. ¶ 53); (3) harassment, a hostile work environment and unequal terms and conditions of employment in violation of the New York State Executive Law (Am. Compl. ¶ 54); (4) wrongful termination in violation of the New York State Executive Law (Am. Compl. ¶ 55); (5) harassment, a hostile work environment and unequal terms and conditions of employment in violation of the New York City Administrative Code (Am. Compl. ¶ 56); (6) wrongful termination in violation of the New York City Administrative Code (Am. Compl. ¶ 57); (7) discrimination on the basis of ancestry in violation of 42 U.S.C. § 1981 (Am. Compl. ¶ 58); (8) a violation of plaintiff's First Amendment rights, pursuant to 42 U.S.C. § 1983 (Am. Compl. ¶ 60); (9) a violation of plaintiff's right to equal protection of the laws, pursuant to 42 U.S.C. § 1983 (Am. Compl. ¶ 62); (10) a violation of plaintiff's right to due process of law, pursuant to 42 U.S.C. §  1983 (Am. Compl. ¶ 64); (11) a violation of plaintiff's First Amendment rights, pursuant to the New York State constitution (Am. Compl. ¶ 66); (12) a

violation of plaintiff's right to equal protection of the laws, pursuant to the New York State constitution (Am. Compl. ¶ 68); (13) a violation of plaintiff's right to due process of law, pursuant to the New York State constitution (Am. Compl. ¶ 70); (14) retaliation in violation of 42 U.S.C. § 1981  (Am. Compl. ¶ 73); (15) retaliation in violation of the New York State Executive Law (Am. Compl. ¶ 76); (16) retaliation in violation of the New York City Administrative Code (Am. Compl. ¶ 79).

Because a number of the claims involve common elements, those claims can be analyzed together.  Plaintiff's claims of national-origin discrimination, hostile environment, wrongful termination and retaliation in violation of Title VII, Sections 1981 and 1983, the New York Executive Law and the New York City Administrative Code all require proof of the same elements and can, therefore, be analyzed collectively.  See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (Title VII, New York State's Human Rights Law and New York City Administrative Code claims); Paulino v. New York Printing Pressman's Union, 301 F. App'x 34, 37 (2d Cir. 2008) (VII and Section 1981); Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003) (Title VII retaliation claims); Abdu-Brisson v. Delta Airlines, Inc., supra, 239 F.3d at 466; Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000) (Title VII claim); Crosswell v. Triborough Bridge & Tunnel Auth.,

03 Civ. 2990 (NRB), 2007 WL 2274252 at *6 n.17 (S.D.N.Y. Aug. 7, 2007) (Buchwald, D.J.) (Title VII, Sections 1981, 1983 and New York State Executive Law); <u>Johns v. Home Depot U.S.A., Inc.</u>, 03 Civ. 4522 (DC), 2005 WL 545210 at *4 (S.D.N.Y. Mar. 8, 2005) (Chin, D.J.) (Title VII and New York State's Human Rights Law claims).[4]

      1.   Plaintiff's Claim of
          <u>Disparate Treatment</u>

Plaintiff's first, third and fifth claims allege that plaintiff was subject to harassment, disparate treatment and a hostile work environment, in violation of federal, state and city

---

[4]Although it is a technical point, I note that to the extent plaintiff "seeks to vindicate any independent rights under 42 U.S.C. § 1981, he must do so via claims under § 1983." <u>Whaley v. City Univ. of New York</u>, 555 F. Supp. 2d 381, 400 (S.D.N.Y. 2008)(McMahon, D.J.), <u>citing</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 735 (1989) (collecting cases within the Second Circuit reaching the same conclusion). Discrimination cases brought under Section 1983 are governed by the same standards applicable to Title VII discrimination claims. <u>Back v. Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 122-23 (2d Cir. 2004).

anti-discrimination laws.[5]  I construe plaintiff's seventh claim

to assert the same facts as a violation of 42 U.S.C. § 1981.

A plaintiff can establish a claim for disparate treat-

ment

> (1) by showing that he has suffered an adverse job
> action under circumstances giving rise to an inference
> of discrimination on the basis of race, color, reli-
> gion, sex, or national origin, or (2) by demonstrating
> that harassment on one or more of these bases amounted
> to a hostile work environment.

Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004), citing

Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001).  The record

in this case does not contain sufficient evidence to support

either alternative.

---

[5]Throughout the Amended Complaint, plaintiff makes repeated
references to a "pattern and practice" of discrimination and a
"pattern and practice" of retaliation.  If plaintiff is
attempting to assert a pattern and practice claim, it appears
that the claim is legally defective because such claims can be
asserted only in the context of a class action.  Garrett v.
Mazza, 97 Civ. 9148 (BSJ), 2010 WL 653489 at *11 n.8 (S.D.N.Y.
Feb. 22, 2010) ("To the extent that Plaintiff is attempting to
assert a 'pattern or practice' claim of discrimination, such a
claim fails as a matter of law.  While neither the Supreme Court
nor the Second Circuit have specifically addressed the question
of whether an individual plaintiff can maintain a private,
non-class action pattern or practice claim, district courts
within this circuit have suggested that they cannot. . . .
(citations omitted))(Jones, D.J.).

a.  <u>Adverse Job Action</u>

Apart from plaintiff's termination, which is discussed in Section III(B)(2), below, there is no evidence that plaintiff suffered an adverse job action, let alone an adverse job action that was suffered under circumstances giving rise to an inference of discrimination.

An adverse job action is

> a "materially adverse change" in the terms and condi-tions of employment.  <u>See</u> <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 446 (2d Cir. 1999). To be materially adverse, a change in working condi-tions must be "more disruptive than a mere inconve-nience or an alteration of job responsibilities." <u>Terry</u>, 336 F.3d at 138.  Examples of such a change include "termination of employment, a demotion evi-denced by a decrease in wage or salary, a less distin-guished title, a material loss of benefits, signifi-cantly diminished material responsibilities, or other indices . . . unique to a particular situation."  <u>Id</u>.

<u>Sanders v. N.Y.C. Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004); <u>accord</u> <u>Cunningham v. New York State Dep't of Labor</u>, 326 F. App'x 617, 619 (2d Cir. 2009) ("As we have previously held, everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII. . . . Instead, an actionable or cognizable adverse employment action is a materially significant disadvantage with respect to the terms of [plaintiff's] employment." (inner quota-tions omitted)); <u>Lewis v. City of Buffalo Police Dep't</u>, 311 F.

41

App'x 417, 420 (2d Cir. 2009); <u>Behringer v. Lavelle Sch. for the</u>
<u>Blind</u>, 08 Civ. 4899 (JGK), 2010 WL 5158644 at *11 (S.D.N.Y. Dec.
17, 2010) (Koeltl, D.J.).

The Amended Complaint alleges three specifications in
support of plaintiff's claim of disparate treatment.  None are
sufficient to support a disparate treatment claim.

First, plaintiff alleges that he was more closely
supervised and monitored than non-West Indian faculty members
(<u>see</u> Am. Compl. ¶ 28).  Increased monitoring is not an adverse
employment action, however, because it does not alter the terms
and conditions of employment.  <u>Casseus v. Verizon N.Y., Inc.</u>, 722
F. Supp. 2d 326, 344-45 (E.D.N.Y. 2010); <u>Valenti v. Massapequa</u>
<u>Union Free Sch. Dist.</u>, 03-CV-1193 (JFB)(MLO), 04-CV-5271
(JFB)(MLO), 2006 WL 2570871 at *11 (E.D.N.Y. Sept. 5, 2006);
<u>Scafidi v. Baldwin Union Free Sch. Dist.</u>, 295 F. Supp. 2d 235,
239 (E.D.N.Y. 2003); <u>Bennett v. Watson Wyatt & Co.</u>, 136 F. Supp.
2d 236, 248 (S.D.N.Y. 2001) (Scheindlin, D.J.).

Second, plaintiff alleges that he was subjected to
unjustified "write ups" concerning his performance while non-West
Indian teachers were not written up for engaging in identical
conduct and that he was written up for lateness while non-West
Indian teachers who arrived at school at the same time plaintiff
were not written up (Am. Compl. ¶ 27).  "Reprimands or negative

evaluation letters may, in some circumstances, constitute adverse
employment action, . . . and whether they do is typically a
question of fact for the jury." Lawrence v. Mehlman, 389 F.
App'x 54, 56 (2d Cir. 2010) (citations omitted).  However, where
there is no evidence that would support a finding that a repri-
mand has an impact on the terms and conditions of employment, it
appears that the reprimand does not constitute an adverse employ-
ment action.  Lawrence v. Mehlman, supra, 389 F. App'x at 56
(affirming summary judgment in favor of defendant where reprimand
was removed from plaintiff's file after six weeks with no evi-
dence of any consequences); Sanders v. N.Y.C. Human Res. Admin.,
supra, 361 F.3d at 756 (affirming defendant's verdict where there
was no evidence that negative evaluations affected the terms and
conditions of employment); Honey v. Cnty. of Rockland, 200 F.
Supp. 2d 311, 320 (S.D.N.Y. 2002) (McMahon, D.J.) ("However,
courts in this circuit have found that reprimands, threats of
disciplinary action and excessive scrutiny do not constitute
adverse employment actions in the absence of other negative
results such as a decrease in pay or being placed on proba-
tion."); Stembridge v. City of New York, 88 F. Supp. 2d 276, 283
(S.D.N.Y. 2000) (Motley, D.J.) (no actionable harm where "repri-
mand contained a warning that repetition of improper behavior
could result in disciplinary action but contained no indication

43

of any planned discipline or further action"); Castro v. N.Y.C.
Bd. of Educ. Pers., 96 Civ. 6314 (MBM), 1998 WL 108004 at *7
(S.D.N.Y. Mar. 12, 1998) (Mukasey, D.J.) ("[A]lthough reprimands
and close monitoring may cause an employee embarrassment or
anxiety, such intangible consequences are not materially adverse
alterations of employment conditions."). Plaintiff does not
allege or offer any evidence that the "write ups" to which he was
subjected had any effect on the terms or conditions of his
employment. There is no evidence or allegation that he was
disciplined as a result of the "write ups," that his pay or
promotional opportunities were affected by the "write ups," or
that the "write ups" played any role in any of decisions concern-
ing the continuation of plaintiff's employment. Under these
circumstances, the "write ups" do not constitute an adverse
employment action.

        Plaintiff's final allegation of disparate treatment is
based on his allegation that while at MS 113 he was denied
adequate supplies of textbooks, the teacher's edition of a
textbook, operational computers and an overhead projector (see
Am. Compl. ¶¶ 15-22). These complaints are too minor to consti-
tute adverse employment actions. Stoddard v. Eastman Kodak Co.,
309 F. App'x 475, 479 (2d Cir. 2009) ("Stoddard's other disparate
treatment claims including . . . inadequate office supplies and

space, do not constitute adverse employment actions."); <u>Terry v.
Ashcroft</u>, <u>supra</u>, 336 F.3d at 138 (an adverse change must be "more
disruptive than a mere inconvenience or an alteration of job
responsibilities" (internal quotation marks omitted)).[6]

b.  <u>Hostile Work Environment</u>

Plaintiff's allegations do not even come close to
stating a claim for a hostile work environment.  Thus, even if I
were to disregard all the evidence offered by defendants on the
pending motion, plaintiff's hostile environment claim would have
to be dismissed.

The requirements of a hostile environment claim were
exhaustively reviewed by the Court of Appeals for the Second
Circuit in <u>Alfano v. Costello</u>, 294 F.3d 365, 373-74 (2d Cir.
2002):

A hostile work environment claim requires a show-
ing [1] that the harassment was "sufficiently severe or

---

[6]I do not suggest that depriving an employee of supplies can
never be an adverse employment action.  If an employer were to
deprive an employee of equipment essential or virtually essential
to the performance of the employee's duties and, thereby, create
a situation in which the employee was destined to fail at her
job, the employer's conduct might be an adverse employment
action.  All of the critiques of plaintiff's performance at MS
113 focused on his preparation, teaching technique and classroom
management (Exs. 7, 10, 11, 17, 18, 20 to Profeta Decl.).  It
does not appear that any of these issues would have been remedied
by the equipment he claims he was denied.

pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999). This test has objective and subjective elements:  the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that envi-ronment to be abusive.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). As a general rule, incidents must be more than "epi-sodic; they must be sufficiently continuous and con-certed in order to be deemed pervasive." Perry, 115 F.3d at 149 (citation and internal quotation marks omitted).  Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. Brennan, 192 F.3d at 318; see also Faragher v. City of Boca Raton, 524 U.S. 775, 27 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment"). But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace.  See, e.g., Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (vile and sexually ex-plicit verbal abuse of a female firefighter that chal-lenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes); Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999) (observing that a single sexual assault may be sufficient to alter the terms and condi-tions of the victim's employment).

In short, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and con-certed' to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Perry, 115 F.3d at 149). To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. Harris, 510 U.S. at 23, 114 S.Ct. 367 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offen-sive utterance; and whether it unreasonably interferes with an employee's work performance"); see also Cruz, 202 F.3d at 570.

(brackets in original). See also Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (per curiam); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006); Petrosino v. Bell Atl., 385 F.3d 210, 221-22 (2d Cir. 2004); Feingold v. New York, 366 F.3d 138, 149-50 (2d Cir. 2004) Hayut v. State Univ. of N.Y., 352 F.3d 733, 744-45 (2d Cir. 2003); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).

A hostile environment claim requires evidence that the offensive conduct is severe and pervasive; the offensive conduct need not, however, be intolerable or unendurable.

> While the standard for establishing a hostile work
> environment is high, we have repeatedly cautioned
> against setting the bar too high, noting that
> "[w]hile a mild, isolated incident does not make a
> work environment hostile, the test is whether 'the
> harassment is of such quality or quantity that a
> reasonable employee would find the conditions of
> her employment <u>altered</u> <u>for</u> <u>the</u> <u>worse</u>.'" (alter-
> ation and emphasis in the original).
>
> Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)
> (quoting <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>,
> 223 F.3d 62, 70 (2d Cir. 2000)).  "The environment need
> not be 'unendurable' or 'intolerable.'"  <u>Id</u>.  In brief,
> "the fact that the law requires harassment to be severe
> or pervasive before it can be actionable does not mean
> that employers are free from liability in all but the
> most egregious cases."  <u>Id</u>. (quoting <u>Whidbee</u>, 223 F.3d
> at 70 (internal quotation marks omitted)).

<u>Feingold v. New York</u>, <u>supra</u>, 366 F.3d at 150.

In determining whether the level of workplace miscon-
duct constitutes an actionable "hostile environment," no single
factor is determinative; rather, the court must consider the
totality of the circumstances.  <u>Faragher v. City of Boca Raton</u>,
524 U.S. 775, 787-88 (1998); <u>Raniola v. Bratton</u>, <u>supra</u>, 29 243
F.3d at 617; <u>Cruz v. Coach Stores, Inc.</u>, <u>supra</u>, 202 F.3d at 570.
<u>See</u> <u>also</u> <u>Hayut v. State Univ. of N.Y.</u>, <u>supra</u>, 352 F.3d at 746
(hostile environment claims are "fact-specific and circumstance-
driven"). "Factors that a court might consider in assessing the
totality of the circumstances include: (1) the frequency of the
discriminatory conduct; (2) its severity; (3) whether it is
threatening and humiliating, or a mere offensive utterance; and

(4) 'whether it unreasonably interferes with the performance of an employee's work performance.'" <u>Patane v. Clark</u>, <u>supra</u>, 508 F.3d at 113, <u>quoting</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993).

The Amended Complaint alleges two possible bases for a hostile environment claim:  (1) Person's December 2002 comments (Am. Compl. ¶ 9) and (2) the letters found in plaintiff's class-room in June 2003 (Am. Compl. ¶ 32).  Although offensive, Person's comments do not rise to the level of severity necessary to support a hostile environment claim.  Person's comments were made only once; they were not an ongoing, pervasive course of work-place conduct.  Moreover, plaintiff's allegations demonstrate that Person's comments met with widespread condemnation within MS 113 (Am. Compl. ¶¶ 9-10), and resulted in Person's issuing an apology within two weeks of his remarks and issuing a second apology approximately two weeks after the initial apology (Ex. 12 to Profeta Decl.).  Given these facts including the prompt steps taken to remediate the effects of Person's comments, I conclude that Person's comments are neither sufficiently severe nor sufficiently pervasive to sustain a hostile environment claim.

The only other event alleged by plaintiff which might support a hostile environment claim is his allegation that in June 2003, letters were found in plaintiff's class room referring

49

to plaintiff and other individuals of West Indian ancestry in highly inflammatory racist terms (Ex. 22 to Profeta Decl.). There is no evidence in the record connecting these letters to any of the defendants, and, therefore, these letters cannot support a hostile environment claim.

c.  Summary

Thus, summary judgment should be granted dismissing plaintiff's first, third, fifth and seventh claims.

2.  Plaintiff's Claim of
    Wrongful Termination
    Based on Discrimination

Plaintiff's second, fourth and sixth claims allege that he was wrongfully terminated on the basis his national origin in violation of federal state and city anti-discrimination laws.  I also construe plaintiff's seventh claim to assert the same facts as a violation of 42 U.S.C. § 1981.  I presume this claim is based on plaintiff's termination from MS 113 and MS 135.

Plaintiff's claims of discriminatory wrongful termina-tion under Section Title VII, the New York Executive Law, the New York City Administrative Code and Section 1981 are all  analyzed under the now familiar framework first set forth in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 506-10 (1993).

"Following the Supreme Court's directive, plaintiff
must initially come forward with facts sufficient to establish a
prima facie case that [he suffered an adverse employment action]
under circumstances giving rise to an inference of discrimina-
tion." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d
Cir. 1998).  "The burden of establishing a prima facie case is
not a heavy one.  One might characterize it as minimal." Carlton
v. Mystic Transp. Inc., supra, 202 F.3d at 134; see Galabya v.
N.Y.C. Bd. of Educ., supra, 202 F.3d at 639; Scaria v. Rubin, 117
F.3d 652, 654 (2d Cir. 1997) (per curiam); Chambers v. TRM Copy
Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (describing the burden
of production as de minimis).

If a plaintiff succeeds in establishing a prima facie
case of discrimination, a presumption is created "that the
employer discriminated against the employee in an unlawful
manner," Greenway v. Buffalo Hilton Hotel, supra, 143 F.3d at 52,
and the burden then shifts to the employer to rebut the presump-
tion by articulating a legitimate, non-discriminatory reason for
its actions.  Carlton v. Mystic Transp., Inc., supra, 202 F.3d at
134; Gallo v. Prudential Residential Servs. Ltd. P'ship, supra,

51

22 F.3d at 1224; Bickerstaff v. Vassar Coll., 196 F.3d 435, 446

(2d Cir. 1999).

> The defendant's burden of production also is not a
> demanding one; [it] need only offer such an explanation
> for the employment decision.  Although the burden of
> production shifts to the defendant, the ultimate burden
> of persuasion remains always with the plaintiff.

Bickerstaff v. Vassar Coll., supra, 196 F.3d at 446 (citations

omitted).

If the employer articulates a non-discriminatory reason

for the termination, the presumption of discrimination raised by

the prima facie case "simply drops out of the picture." St.

Mary's Honor Ctr. v. Hicks, supra, 509 U.S. at 510-11. See

Carlton v. Mystic Transp., Inc., supra, 202 F.3d at 134-35.  At

this point, the burden shifts back to the plaintiff to offer

proof that would allow a rational fact finder to conclude that

the employer's proffered reason for the termination was

pretextual. St. Mary's Honor Ctr. v. Hicks, supra, 509 U.S. at

507-08; Carlton v. Mystic Transp., Inc., supra, 202 F.3d at 135.

Although the presumption of discrimination "drops out of the

picture" once the defendant meets its burden of production, "the

trier of fact may still consider the evidence establishing the

plaintiff's prima facie case and inferences properly drawn

therefrom . . . on the issue of whether the defendant's explana-

tion is pretextual . . . ." Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 143 (2000) (internal quotation marks omitted).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Prods., Inc., supra, 530 U.S. at 148.

In Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000), the Court of Appeals for the Second Circuit explained the Supreme Court's decision in Reeves as follows:

> In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that [a claimant] offer more than a prima facie case and evidence of pretext . . . .  But the converse is not true; following Reeves, we decline to hold that no [] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext.  Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  Reeves, 530 U.S. at ---, 120 S.Ct. at 2106 (internal quotation marks omitted).

See also Hill v. Citibank Corp., 312 F. Supp. 2d 464, 478 (S.D.N.Y. 2004) (Koeltl, D.J.).

Furthermore, in James v. N.Y. Racing Ass'n, 233 F.3d 149, 155 (2d Cir. 2000), the Court of Appeals for the Second Circuit explained that proof that the employer's non-discrimina-

tory explanation is false does not inevitably establish illegal discrimination:

> We reasoned in <u>Fisher</u> that "evidence constituting a prima facie case prior to the employer's proffer of a reason, coupled with the error or falsity of the employer's proffered reason may -- or may not -- be sufficient to show illegal discrimination." <u>Fisher</u>, 114 F.3d at 1333.  In nearly identical terms the Supreme Court explained in <u>Reeves</u> that in some circumstances, a prima facie case plus falsity of the employer's explanation can, without more, be enough to support a reasonable finding that prohibited discrimination has occurred . . . .

In order to meet his burden with respect to a <u>prima facie</u> case of discrimination, plaintiff must offer evidence sufficient to give rise to an issue of fact as to four elements: (1) he is a member of a protected class (2) he was qualified for the position;[7] (3) he was subject to an adverse employment action

---

[7]As explained by the Honorable Denise L. Cote, United States District Judge, in <u>Velez v. SES Operating Corp</u>., 07 Civ. 10946 (DLC), 2009 WL 3817461 at *8 (S.D.N.Y. Nov. 12, 2009), although some courts have articulated this prong as requiring a showing that plaintiff was performing his duties in a satisfactory manner, the difference in language does not connote a substantive difference from the formulation set forth in the text:

> The definition of the second prong admits of several linguistic variations.  In the majority of cases, the second prong is described as the plaintiff's duty to show, at a minimum, that she was "qualified for the position." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir.2008) (citation omitted) . . . . A few cases, however, define the prong as requiring plaintiff to show that, prior to being fired, she had been "performing h[er] duties satisfactorily." <u>Slattery v.</u>
> (continued...)

and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005); Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 316 (2d Cir. 1999); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); Hills v. City of New York, 03 Civ. 4265 (WHP), 2005 WL 591130 at *3 (S.D.N.Y. Mar. 15, 2005) (Pauley, D.J.); Beckmann v. Darden, 351 F. Supp. 2d 139, 146 (S.D.N.Y. 2004) (Robinson, D.J.); Williams v. Salvation Army, 108 F. Supp. 2d 303, 308 (S.D.N.Y. 2000) (Berman, D.J.), citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

---

[7](...continued)
Swiss Reins. Am. Corp., 248 F.3d 87, 90 (2d Cir. 2001) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)); see also Dawson, 398 F.3d at 216 (requiring a Title VII plaintiff to show he was "competent to perform the job or is performing his duties satisfactorily"). As Slattery itself pointed out, however, this latter standard should not be interpreted as "rais[ing] the standard set by the Supreme Court for what suffices to show qualification," and thus, the difference "between 'qualified for the position' and 'performing satisfactorily'" is only a "mere variation in terminology." Slattery, 248 F.3d at 91 (citation omitted). Instead, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." Id. at 92.

For purposes of this motion I shall assume without deciding that plaintiff can establish that he was qualified for the teaching positions he held at MS 113 and MS 135, see <u>Gregory v. Daly</u>, 243 F.3d 687, 696 (2d Cir. 2001) ("To show 'qualification' . . . the plaintiff need not show perfect performance or even average performance. Instead, [he] need only make the minimal showing that <u>[he] possesses the basic skills necessary for performance of the job</u>." (inner quotations and citations omitted; emphasis in original)), that he is a member of a protected class and that his termination constitutes an adverse employment action.   Nevertheless, there is no evidence that gives rise to an inference that plaintiff was terminated under circumstances that give rise to an inference of discrimination based on plaintiff's national origin.  With the exception of Person's December 2002 comment, which did not single out plaintiff's country of origin but, rather, referred to several nations, there is no evidence of biased comments directed at individuals of West Indian ancestry and no evidence that West Indian faculty and staff at the schools were treated differently than individuals of non-West Indian ancestry.  Although plaintiff makes numerous conclusory allegations in the complaint that faculty and staff of West Indian ancestry were treated differently than non-West Indians, plaintiff cannot rely on his plead-

ings to defeat a motion for summary judgment but, rather must offer evidence to demonstrate the existence of a genuine issue of fact.  Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) ("[[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."); United States v. Certain Real Property & Premises Known As:  4003-4005 5th Ave., Brooklyn, NY, 55 F.3d 78, 82 n.1 (2d Cir. 1995) (same).

Moreover, even if plaintiff had satisfied all the elements of a prima facie case, his claim still fails.  Defendants have offered contemporaneous performance reviews demonstrating that plaintiff's performance was unsatisfactory and that it was the deficiencies in plaintiff's performance that were the cause of his termination (Exs. 7, 8, 9, 10, 11, 17, 18, 20, 29, 30, 31 and 32 to Profeta Decl.).  Thus, defendants have not only articulated a non-discriminatory reason for plaintiff's termination, they have offered unrebutted contemporaneous documentary evidence of non-discriminatory reasons for terminating plaintiff's employment.  Pursuant to the McDonnell Douglas analysis, the burden now shifts back to plaintiff to demonstrate that these

reasons are pretextual.  Plaintiff offers no evidence of pretext and my review of the record discloses none.[8]

Thus, summary judgment should be granted dismissing plaintiff's second, fourth, sixth and seventh claims.

> 3.  Plaintiff's Retaliation Claims under Section 1981, the New York State Executive Law and the New York City Administrative Code

Plaintiff's fourteenth, fifteenth and sixteenth claims allege that plaintiff was the victim of retaliation in violation

---

[8]Plaintiff argues that the reversal of the unsatisfactory rating he received at MS 113 is evidence of the performance issues cited by defendants are pretextual and, by virtue of the doctrine of collateral estoppel, preclude defendants from asserting otherwise (Plaintiff's Memo at 8, 12-13).  Although there is no dispute that plaintiff appealed the unsatisfactory rating he received at MS 113 and succeeded in overturning, it does not necessarily follow that the doctrine of collateral estoppel applies.  The doctrine of collateral estoppel applies onloy where the issues in the two disputes are identical.  "The party invoking collateral estoppel must demonstrate the identity of the issues in the prior and current litigations and must establish that the issues were previously decided on the merits." Pack v. Artuz, 348 F. Supp. 2d 63, 70 (S.D.N.Y. 2004) (Marrero, D.J.).  There is no evidence in the record concerning what, if anything, was decided in plaintiff's appeal from his unsatisfactory rating, and, therefore, no basis for concluding that the doctrine of collateral estoppel is applicable here. Richards v. Calvet, 99 Civ. 12172 (RJH)(MHD), 2005 WL 743251 at *9 (S.D.N.Y. Mar. 31, 2005) (rejecting defendants' attempt to invoke collateral estoppel based on post-termination grievance proceeding in employment discrimination action against New York City Board of Education) (Holwell, D.J.).  See generally Fayer v. Town of Midlebury, 258 F.3d 117 (2d Cir. 2001)

of Section 1981, the New York State Executive Law and the New York City Administrative Code, respectively.[9]

Retaliation claims under Section 1981 and the New York State Executive Law are analyzed under the same framework that is applicable to retaliation claims brought under Title VII.  Vito v. Bausch & Lomb Inc., Docket No. 10-756-cv, 2010 WL 5129223 at *3 (2d Cir. Dec. 17, 2010); Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010); Bennett v. Verizon Wireless, 326 F. App'x 9, 10 (2d Cir. 2009).  As explained below, the reach of the anti-retaliation provision of the New York City Administrative Code is some what broader.  Fincher v. Depository Trust & Clearing Corp., supra, 604 F.3d at 723.

To establish a prima facie case of retaliation under either Title VII or the New York State Human Rights Law, a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against him and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 177 (2d Cir. 2006); Constance v. Pepsi Bottling Co. of

---

[9]Oddly, plaintiff does not assert a retaliation claim under Title VII.

<u>N.Y.</u>, 03-CV-5009 (CBA)(MDG), 2007 WL 2460688 at *34 (E.D.N.Y.

Aug. 24, 2007).  Under the Administrative Code,

> retaliation "in any manner" is prohibited, and "[t]he
> retaliation . . . need not result in an ultimate action
> with respect to employment . . . or in a materially
> adverse change in the terms and conditions of employ-
> ment."  N.Y.C. Admin. Code § 8-107(7); <u>see also</u> <u>Wil-</u>
> <u>liams</u>, 61 A.D.3d at 69-72, 872 N.Y.S.2d at 33-35;
> <u>Sorrenti v. City of New York</u>, 17 Misc. 3d 1102(A), 851
> N.Y.S.2d 61 (Table) (N.Y. Sup. 2007) (unreported deci-
> sion) ("[T]he City Council enacted a less restrictive
> standard [than the federal and state standard] to
> trigger a [CHRL] violation in that it is now illegal to
> retaliate in any manner."); <u>Pilgrim v. McGraw-Hill</u>
> <u>Cos., Inc.</u>, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009)
> ("The <u>prima</u> <u>facie</u> standard for retaliation claims under
> the CHRL is different [from the federal and state
> standard], in that there is no requirement that the
> employee suffer a materially adverse action.  Instead,
> the CHRL makes clear that it is illegal for an employer
> to retaliate in 'any manner.'").

<u>Fincher v. Depository Trust & Clearing Corp.</u>, <u>supra</u>, 604 F.3d at

723.

A plaintiff may establish the requisite causal connec-

tion between the protected activity and the retaliatory conduct

"(1) indirectly, by showing that the protected activity was

followed closely by discriminatory treatment, or . . . (2)

directly, through evidence of retaliatory animus directed against

the plaintiff by the defendant."  <u>Gordon v. N.Y.C. Bd. of Educ.</u>,

232 F.3d 111, 117 (2d Cir. 2000); <u>White v. Whitman</u>, 99 Civ. 4777

(FM), 2002 WL 776589 at *10 (S.D.N.Y. Apr. 26, 2002) (Maas,

M.J.).  Where, as here, a plaintiff relies on temporal proximity

as circumstantial evidence of causation, the "temporal proximity must be 'very close.'"  Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 385 (S.D.N.Y. 2002) (Scheindlin, D.J.), quoting Clark Cnty. Sch. Dist. v. Breeden, supra, 532 U.S. at 273; accord Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the . . . adverse action may in itself by sufficient to establish the requisite causal connection.").  However, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).

Once plaintiff demonstrates a prima facie case, the burden shifts to defendant to articulate legitimate, non-retalia-tory reasons for its actions.  Once the defendant does so, the burden shifts back to plaintiff to show that the articulated reasons are pretextual.  Papelino v. Albany Coll. of Pharmacy of Union Univ., Docket No. 09-4248-cv, 2011 WL 199124 at *8 (2d Cir. Jan. 24, 2011).  Although temporal proximity can be sufficient to support an inference of causation at the prima facie stage, it is

insufficient to show pretext at the third step.  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.").

The Amended Complaint does not identify the specific protected conduct that gives rise to plaintiff's retaliation claims nor does it identify the allegedly retaliatory conduct he suffered as a result of his engaging in protected activity.  It appears there are two possible events that constitute the pro-tected activity underlying the retaliation claim, namely plain-tiff's complaints concerning Person's December 2002 comments and the complaint of discrimination filed with the Board of Education Office of Equal Opportunity (Ex. 25 to Profeta Decl.).  It is at least theoretically possible that the former event motivated plaintiff's firing from MS 113; the lapse of six months is not fatal to an inference of retaliation.  See Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (affirming factual finding of retaliation notwithstanding eight-month gap between

EEOC complaint and retaliatory act).  The latter could not have

motivated plaintiff's termination.  Plaintiff was terminated from

MS 113 on June 13, 2003 (Ex. 21 to Profeta Decl.)  Plaintiff's

complaint to the Board of Education's Office of Equal Opportunity

refers to events occurring on June 17, 2003 (Ex. 25 to Profeta

Decl. at 2), and must, therefore, have been filed after that

date.  Plaintiff's complaint to the Office of Equal Opportunity

predated his termination from MS 135 by two years, and it appears

that that gap is too great to support an inference of causation.

See Hollander v. Am. Cyanimid Co., 895 F.2d 80, 84-86 (2d Cir.

1990); Woods v. Enlarged City Sch. Dist., 473 F. Supp. 2d 498,

528-29 (S.D.N.Y. 2007) (Conner, D.J.).

        Assuming without deciding that plaintiff has estab-

lished a prima facie case with respect to his termination from MS

113, his retaliation claims brought under state law and the

administrative code, must, nevertheless, be dismissed.  As noted

above, defendants offer contemporaneous documentary evidence of

deficient performance by plaintiff at both MS 113 (Exs. 7, 8, 9,

10, 11, 17, 18, 20 to Profeta Decl.) and MS 135 (Exs. 29, 30, 31

and 32 to Profeta Decl.).[10]  Thus, the defendants have offered

---

        [10]The fact that plaintiff's deficient performance reviews at
MS 113 predate Person's December 2002 comments and any criticism
of those comments by plaintiff negates an inference that
                                              (continued...)

substantial evidence that plaintiff was terminated for poor performance; the foregoing authorities teach that the burden now shifts to plaintiff to offer evidence that the performance-based reasons given defendant are pretextual.  As demonstrated above, plaintiff has not offered evidence sufficient to create an issue of fact that defendants' contention that plaintiff was terminated for poor performance is pretextual.  Just as the absence of evidence of pretext warrants summary judgment dismissing plain-tiff's discrimination claim, it also warrants summary judgment dismissing his retaliation claim.

Given the broader standard of adverse conduct that will satisfy the adverse action element of a claim under the Adminis-trative Code, I have also considered whether the daily hardships suffered by plaintiff could support a retaliation claim and conclude that they do not.  Plaintiff does not cite any specific similarly situated, non-protesting faculty members who did not suffer from the same lack of books, equipment, etc. that plain-tiff cites.  In the absence of specific evidence that non-pro-

---

[10](...continued)
plaintiff received deficient performance reviews to "set up" his termination in June 2003.  <u>Slattery v. Swiss Reins. Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

testing faculty members were treated better, there is no logical basis for an inference that plaintiff's complaints were a cause of his claimed hardships.  <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) ("To survive summary judgment the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. . . . Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." (inner quotations, citations and emphasis omitted); <u>see also</u> <u>Rochetti v. N.Y. State Dep't of Motor Vehicles</u>, No. 02 CV 1710 (SLT)(LB), 2005 WL 2340719 at *7 (E.D.N.Y. June 13, 2005).

Thus, summary judgment should be granted dismissing plaintiffs fourteenth, fifteenth and sixteenth claims.

> 4.  Plaintiff's Claim that
>     his Right to Freedom
>     of Speech under the
>     United States and New
>     York State Constitutions
>     <u>Was Violated</u>

In his eighth and eleventh claims, plaintiff alleges that his right to freedom of speech under the United States and New York State Constitutions was violated.

The Court of Appeals has recently summarized the standard applicable to assessing a public employee's First Amendment retaliation claim.

> This standard "entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). To survive summary judgment on a First Amendment retaliation claim, a public employee "must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action." Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007). In addition, "when the plaintiff's protected conduct is a unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act, . . . claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct." Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Indus. Dev. Agency, 77 F.3d 26, 33 (2d Cir. 1996). The plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action." Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003).

Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011).

In order to demonstrate causation, a plaintiff "must show that the protected speech was a substantial motivating factor in the adverse employment action." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006)

(quotation marks omitted).  "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal v. Goord, supra, 558 F.3d at 129; accord Krukenkamp v. State Univ. of N.Y. at Stony Brook, 395 F. App'x 747, 750 (2d Cir. 2010).

          The "adverse employment action" necessary to sustain a First Amendment retaliation action is not coextensive with the adverse employment action required to sustain a Title VII claim. "[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" Dillon v. Morano, 497 F.3d 247, 254 (2d Cir. 2007), quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006).  Thus, the standard for finding an adverse employment action in the context of a First Amendment retaliation claim is less demanding. Zelnik v. Fashion Inst. of Tech., supra, 464 F.3d at 225.  "Nevertheless, the alleged act of retaliation must be more than de minimis. . . . 'Indeed, it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.'" McAllan v. Von Essen, 517 F. Supp. 2d 672, 680 (S.D.N.Y. 2007)

(Holwell, D.J.), quoting Zelnik v. Fashion Inst. of Tech., supra, 464 F.3d at 226.

If a plaintiff musters sufficient evidence to create an issue of fact as to each of the elements set forth above summary judgment is inappropriate unless the defendant establishes that there is no genuine issue of fact that it would have taken the same adverse employment action even without the protected conduct, Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 251-52 (2d Cir. 2006), the allegedly protected speech was made as part of the employee's official duties, Garcetti v. Ceballos, 547 U.S. 410, 426 (2006), or that "the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006), overruled on other grounds, Appel v. Spiridon, 531 F.3d 138, 140 (2d Cir. 2008); see also Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir. 2003).

The Amended Complaint does not identify the speech that underlies plaintiff's First Amendment retaliation claim, but it appears that the only matter of public concern about which plaintiff complained is Person's December 2002 comments.  At some unspecified time and in some unspecified manner, plaintiff claims

68

to have protested these remarks[11] and to have been the victim of
some unspecified retaliatory conduct (see Am. Compl. ¶¶ 9, 11,
12).  Reading the Amended Complaint leniently, plaintiff appears
to be alleging that the acts of retaliation consisted of:  (1)
the depositing of anonymous letters by unknown individuals in
plaintiff's mail box describing those who protested Person's
remarks as "evil forces;" (2) the removal of student work from
bulletin boards; (3) exclusion of West Indian teachers from
training programs; (4) providing plaintiff's classes with an
inadequate number of textbooks and with defaced textbooks; (5)
failing to provide plaintiff with a teacher's edition of a
textbook; (6) depriving plaintiff's students of adequate access
to the library; (7) depriving plaintiff's students of adequate,
operational computers and (8) failing to provide plaintiff with
an overhead projector (Am. Compl. ¶¶ 12-20).  I shall also assume
that he is alleging that his dismissal from MS 113 was retalia-
tory.

Even before considering the evidence offered by defen-
dants in support of their motion, there are several readily

---

[11]The only documentary evidence in the record of specific
complaints by plaintiff regarding Person's December 2002 remarks
a May 27, 2003 letter from plaintiff to the Chancellor of the
Department of Education (Ex. 19 to Profeta Decl.) and his June
2003 complaint to the Department of Education's Office of Equal
Opportunity (Ex. 25 to Profeta Decl.).

identifiable problems with the claim.  Because plaintiff does not
identify what he did to protest Person's comments, when he did it
or when he suffered the alleged adverse action described in the
preceding paragraph, it is extremely difficult to infer causation
from temporal proximity.  Second, plaintiff does not allege that
only faculty members who protested Person's comments suffered the
adverse actions, further attenuating the inference of causation.
Third, plaintiff does not allege that all faculty members who
protested Person's comments were subjected to the adverse actions
alleged by plaintiff, which even further attenuates an inference
of causation.  In short, even without considering defendants'
evidence, the basis for inferring causation is somewhere between
thin and non-existent.

When defendants' evidence in support of their motion is
considered, there is no genuine issue of fact for trial.

- Letters Referring to "Evil Forces" -- There is no
  evidence connecting these letters to any of the defen-
  dants.

- Removal of Student Work from Bulletin Boards -- Defen-
  dants have offered uncontradicted evidence that student
  work was removed only after the author failed to cor-
  rect errors that had been marked or if it contained
  errors that made it inappropriate to post the work as

exemplary (Ex. 35 to Profeta Decl. at 150-53; Ex. 37 to Profeta Decl. at 57-59).

- <u>Providing Plaintiff's Classes with an Inadequate Number of Textbooks and with Defaced Textbooks</u> -- Defendants have offered that all teachers at MS 113 received the same allocation of textbooks (Ex. 36 to Profeta Decl. at 98-99) and plaintiff could not even remember whether he received his allocation of textbooks before or after Person's December 2002 comments (Ex. 33 to Profeta Decl. at 155).  Defendants also offer evidence that plaintiff's textbooks were replaced after he complained about them (Ex. 35 to Profeta Decl. at 94-95, 156).

- <u>Failing to Provide Plaintiff with the Teacher's Edition of Textbook</u> -- Defendants have offered uncontradicted evidence that teachers's editions of textbooks were distributed to all teachers at the start of the school year and that additional copies were available on request (McKinley Decl. ¶ 3).

- <u>Depriving Plaintiff's Students of Adequate, Operational Computers and Absence of Overhead Projector</u> -- Defendants have offered uncontradicted evidence that plaintiff was not the only faculty member to have had a problem with broken computers (Ex. 35 to Profeta Decl.

71

at 211-13).  Defendants have also offered evidence that plaintiff was issued an overhead projector at the start of the 2002-03 school year, but that it may not have been repaired or replaced if it broke during the school year (McKinley Decl. ¶ 6).

The only allegations of conduct that is arguably retaliatory which defendants have not addressed are plaintiff's allegations that West Indian teachers were excluded from training programs (Am. Compl. ¶ 14) and plaintiff's students were denied access to the library (Am. Compl. ¶ 18).  Both of these allegations are conclusory; plaintiff alleges no facts that would support an inference of causation other than that these acts occurred at some unspecified time after Person's comments. Plaintiff does not even allege that these adverse acts were suffered only by faculty members who protested Person's comments. Given the entirely conclusory nature of these allegations, I conclude that they do not state a claim for retaliation.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) ("[a] complaint of retaliation that is wholly conclusory can be dismissed on the pleadings alone" (citation and internal quotation marks omitted)).[12]

---

[12]In his memorandum of law, plaintiff asserts that only

(continued...)

The only remaining potentially retaliatory act is the termination of plaintiff's employment at MS 113.  However, contemporaneous documentation that predates Person's comments demonstrates that there were substantial issues with plaintiff's performance even before Person's remarks (Exs. 7-11 to Profeta Decl.).  In the absence of evidence to the contrary, I conclude that these documents establish that plaintiff would have been terminated from MS 113 regardless of his protests concerning Person's comments and defeat plaintiff's retaliation claim.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Slattery v. Swiss Reins. Am. Corp., supra, 248 F.3d at 95.

Thus, summary judgment should also be granted dismissing plaintiff's eighth and eleventh claims.

5.  Plaintiff's Equal
Protection Claims

In his ninth and twelfth claims, plaintiff alleges that he has been denied equal protection of the laws in violation of

_____

[12] (...continued)
white faculty and staff were invited to a training session concerning the preparation of Power Point presentations and identifies a "non-white staff member" who was not invited (Plaintiff's Memo at 5).  Plaintiff offers no evidence concerning this incident.

the United States and New York Constitutions, respectively.  To the extent plaintiff is asserting his claim under the United States Constitution, it is brought pursuant to 42 U.S.C. § 1983.

Employment discrimination claims brought by public employees under the Equal Protection Clause and Section 1983 are analyzed under the McDonnell Douglas analysis set forth above.[13] Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010); Kercado-Clymer v. City of Amsterdam, 370 F. App'x 238, 242 n.1 (2d Cir. 2010); Demoret v. Zegarelli, supra, 451 F.3d at 149. Since plaintiff's discrimination claims do not survive the McDonnell Douglas analysis, they also fail as Equal Protection Clause/Section 1983 claims.

---

[13]There are, however, some material differences between and employment discrimination claim brought under Title VII and the Equal Protection Clause/Section 1983.  Individuals can be liable under the Equal Protection Clause/Section 1983; they are not generally liable under Title VII.  Demoret v. Zegarelli, supra, 451 F.3d at 149.  In addition, to establish liability against a municipal instrumentality under the Equal Protection Clause/Section 1983, a plaintiff must establish that the discrimination occurred pursuant to a municipal policy or custom. Shapiro v. N.Y.C. Dep't of Educ., 561 F. Supp. 2d 413, 420 (S.D.N.Y. 2008) (Rakoff, D.J.).  No such showing is required under Title VII.

6.  Plaintiff's Due
    Process Claims

Finally, in his tenth and thirteenth claims, plaintiff alleges that he was denied Due Process under the United States and New York Constitutions, respectively.  To the extent plaintiff is asserting his claim under the United States Constitution, it is brought pursuant to 42 U.S.C. § 1983.

In order to succeed on a claim under the Due Process Clause, the plaintiff must demonstrate that he was deprived of a protected liberty or property interest without due process of law.  "The Fourteenth Amendment due process guarantee, however, only extends to property claims to which an individual has a 'legitimate claim of entitlement.'"  N.Y.S. Nat'l Org. for Women v. Pataki, 261 F.3d 156, 164 (2d Cir. 2001), quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  During the time period at issue, plaintiff was either a provisional or a probationary teacher; he was never a tenured  teacher (Crowe Aff. ¶¶ 2-6), and did not, therefore, have a protected property interest in his continued employment.  McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006); Canty v. Bd. of Educ., 470 F.2d 1111, 1113 (2d Cir. 1972); Rogovin v. N.Y.C. Bd. of Educ., CV-99-3382 (ERK), 2001 WL 936191 at *4 (E.D.N.Y. Aug. 17, 2001).  Thus,

plaintiff has no viable Due Process claim and his tenth and thirteenth claims should, therefore, also be dismissed.

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-fully recommend that defendants' motion for summary judgment be granted in all respects and that the amended complaint be dismissed.

## V.  OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Jed S. Rakoff, United States District Judge, 500 Pearl Street, Room 1340, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male

<u>Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         February 25, 2011

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Earl Antonio Wilson, Esq.
Suite 714
65 Broadway
New York, New York  10006

Lawrence J. Profeta, Esq.
Assistant Corporation Counsel
City of New York
100 Church Street
New York, New York  10007

77